1  JOHNSON BOTTINI, LLP
   FRANK J. JOHNSON (174882)
2  FRANCIS A. BOTTINI, JR. (175783)
   KEITH M. COCHRAN (254346)
3  501 West Broadway, Suite 1720
   San Diego, California 92101
4  Telephone:  (619) 230-0063
   Facsimile:   (619) 238-0622
5
   *Attorneys for Plaintiff David Realty Company*
6

7

8                    UNITED STATES DISTRICT COURT

9                    CENTRAL DISTRICT OF CALIFORNIA

10 DAVID REALTY COMPANY,              Case No.  SACV10-1597 DOC(JEMx)
   derivatively on behalf of
11 CORINTHIAN COLLEGES, INC.,         **VERIFIED SHAREHOLDER
                                      DERIVATIVE COMPLAINT**
12                   Plaintiff,
                                      **JURY TRIAL DEMANDED**
13          vs.

14 JACK D. MASSIMINO, PAUL ST.
   PIERRE, HANK ADLER, JOHN
15 DIONISIO, TERRY O.
   HARTSHORN, ALICE T. KANE,
16 ROBERT LEE, LINDA AREY
   SKLADANY, TIMOTHY
17 SULLIVAN, PETER C. WALLER,
   MATTHEW A. OUIMET,
18 KENNETH S. ORD, and DOES 1- 25
   inclusive,
19                   Defendants,

20          vs.

21 CORINTHIAN COLLEGES, INC., a
   Delaware corporation,
22
                   Nominal Defendant.
23

24

25

26

27

28

   ―――――――――――――――――――――――――――――――――――――――――――――
             VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

FILED  2010 OCT 19  PM 4: 11

## I.    OVERVIEW OF THE ACTION

1.    The federal government manages and administers billions of dollars in student financial assistance programs to students at both non-profit and for-profit educational institutions. But when students default on the federal student loans, the federal government and the taxpayers are responsible for the bill. While students at for-profit institutions represent only 9% of all college students, they receive roughly 25% of all Federal Pell Grants and Loans, and are responsible for 44% of all student loan defaults. Based on the disproportionate percentage of student loan defaults associated with for-profit educational institutions, the federal government instructed the United States General Accounting Office ("GAO") to investigate for-profit colleges.

2.    On August 3, 2010, the GAO issued a report concluding that for-profit educational institutions, like Corinthian Colleges, Inc. ("Corinthian Colleges" or the "Company"), had engaged in an illegal and fraudulent course of action designed to recruit students and over-charge the federal government for the cost of such education.

3.    On August 13, 2010, the DOE released data showing estimated student loan repayment rates. Under the DOE's proposed "gainful employment" rule, for-profit educational providers would fully qualify for federal aid in one of two ways: either more than 45% of their former students are paying off principal on loans, or the debt burden of former students is below 8% of total income or below 20% of discretionary income. Accordingly, schools are eligible for federal loans if they prepare their students for "gainful employment in a recognized profession" under the Higher Education Act of 1965. However, schools lose eligibility if repayment rates are below 35% or debt burden is above 12 percent of total income and 30 percent of discretionary income.

4.    For Corinthian Colleges, the DOE data showed that 33 of the 86 colleges had loan repayment rates of less than 20%, and at other campuses the rates were less than 10%. As a result, Deutsche Bank AG downgraded Corinthian securities to "hold" from "buy" citing the Company's "lower-than-feared" repayment rates.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

5.      Plaintiff David Realty Company, a shareholder of Corinthian Colleges, on behalf of the Company, and by its counsel, submits this Verified Shareholder Derivative Complaint (the "Complaint") against certain officers and directors of Corinthian Colleges concerning wrongdoing that occurred between at least October 2007 and the present (the "Relevant Time Period").  On behalf of Corinthian Colleges, Plaintiff asserts against the Individual Defendants (as defined in ¶27) – Corinthian Colleges's current and former directors and officers – state law claims for breaches of fiduciary duties, abuse of control, gross mismanagement, unjust enrichment, and insider trading seeking to recover substantial losses to Corinthian Colleges and other damages, such as to its reputation and goodwill.

6.      Corinthian Colleges provides various for-profit educational programs and services.  Corinthian Colleges is one of the largest for-profit, post-secondary education companies in the United States and Canada, with more than 110,500 students enrolled as of June 30, 2010.  The Company operates 100 schools in 25 states and 17 schools in Canada.

7.      The Individual Defendants caused the Company to misrepresent that Corinthian Colleges's student enrollment, revenues, and profits were all growing.  But the positive statements regarding the Company's performance and growth made by the Individual Defendants were materially false and misleading when made because the Individual Defendants failed to disclose that the Company's purported growth and profits were achieved through an improper course of conduct, including misleading students into enrolling in Corinthian Colleges's scholastic and educational programs through improper methods and engaging in other manipulative recruiting tactics.

8.      Following the GAO's August 3, 2010 report, a Congressional Committee launched an investigation of such practices.  The U.S Department of Education ("DOE") released data showing that the loan repayment rates for Corinthian College enrollees were well below the level required for federal loan program eligibility.  Further, the Company disclosed that its enrollee default rates had significantly increased.

2

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

1  9.  When this news surfaced, the Company's stock fell over 52% from $9.25

2  on August 2, 2010 to $4.36 on August 24, 2010.

3  **II.  JURISDICTION AND VENUE**

4  10.  Jurisdiction is conferred by 28 U.S.C. §1332.  There is complete diversity

5  among the parties and the amount in controversy exceeds the sum or value of $75,000,

6  exclusive of interest and costs.

7  11.  Venue is proper in this District pursuant to 28 U.S.C. §1391.  Many of the

8  acts complained of herein occurred in this District and Corinthian Colleges's principal

9  executive offices are located at 6 Hutton Centre Drive, Suite 400, Santa Ana, California

10  92707, where the day-to-day operations of the Company are directed and managed.

11  **III.  THE PARTIES**

12  **A.  Plaintiff**

13  12.  Plaintiff David Realty Company is a current shareholder of Corinthian

14  Colleges, was a shareholder of Corinthian Colleges at the time of the transactions and

15  events complained of herein, and has continuously held the stock.  Plaintiff is a citizen of

16  Louisiana.

17  **B.  Nominal Defendant Corinthian Colleges**

18  13.  Nominal Defendant Corinthian Colleges is a Delaware corporation with its

19  principal executive offices located at 6 Hutton Centre Drive, Suite 400, Santa Ana,

20  California 92707.  As of September 21, 2010, Corinthian Colleges had approximately 88

21  million outstanding shares.  Corinthian Colleges is traded on the NASDAQ under the

22  ticker symbol "COCO."

23  **C.  Individual Defendants**

24  14.  Defendant Jack D. Massimino ("Massimino") has been Executive Chairman

25  of the Board of Directors ("Board") since July 2009.  He served as Chief Executive

26  Officer of the Company from November 2004 through June 2009.  In addition, he was

27  Chairman of the Board from August 2008 through June 2009.  Massimino was first

28  appointed to Corinthian Colleges's Board in 1999, and has served as Chair of the Audit

3

1   Committee and as a member of the Compensation Committee.  Upon information and

2   belief, Massimino is a citizen of Utah.   Corinthian Colleges paid Massimino the

3   following compensation:

| Year | Salary | Stock Awards | Option Awards | Incentive Plan Compensation | Other | Total |
|------|--------|--------------|---------------|------------------------------|-------|-------|
| 2010 | $832,000 | $81,447 | $172,682 | $1,913,600 | $32,974 | $3,032,703 |
| 2009 | $832,000 | $0 | $565,696 | $1,913,600 | $32,138 | $3,343,434 |
| 2008 | $800,000 | $124,125 | $2,739,146 | $1,119,333 | $26,251 | $4,808,855 |

10      15.   Defendant Paul St. Pierre ("St. Pierre") is the founder of Corinthian

11  Colleges.  He has served on Corinthian's Board since the Company's inception in July

12  1995 and was elected Vice Chairman of the Board in January 2003.  As one of the

13  original founders of Corinthian Colleges, St. Pierre served as the Company's Executive

14  Vice President of Marketing & Admissions until his retirement in June 2003.  While the

15  Individual Defendants were issuing false and misleading statements, St. Pierre sold

16  175,000 shares of his Corinthian Colleges stock for proceeds of $3,425,517.  Upon

17  information and belief, St. Pierre is a citizen of California.

18      16.   Defendant Hank Adler ("Adler") has served on Corinthian Colleges's Board

19  since August 2004 and is a member of its Audit and Nominating and Corporate

20  Governance Committees.  Upon information and belief, Adler is a citizen of California.

21      17.   Defendant John Dionisio ("Dionisio") has been on Corinthian Colleges's

22  Board since April 2008.  Upon information and belief, Dionisio is a citizen of New

23  York.

24      18.   Defendant Terry O. Hartshorn ("Hartshorn") has served on Corinthian

25  Colleges's Board since September 2005.  He was Chairman of the Board from December

26  2006 until August 2008.  He currently serves as Lead Independent Director and is a

27  member of the Audit Committee.  Upon information and belief, Hartshorn is a citizen of

28  California.

4

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

19.   Defendant Alice T. Kane ("Kane") has served on Corinthian Colleges's Board since July 2005.  She is also a member of its Audit and Compensation Committees.  Upon information and belief, Kane is a citizen of New York.

20.   Defendant Robert Lee ("Lee") has served on Corinthian Colleges's Board since November 2006.  Upon information and belief, Lee is a citizen of California.

21.   Defendant Linda Arey Skladany ("Skladany") has served on Corinthian Colleges's Board since its initial public offering in February 1999.  She is a member of the Board's Compensation and Nominating and Corporate Governance Committees.  Upon information and belief, Skladany is a citizen of Virginia.

22.   Defendant Timothy Sullivan ("Sullivan") joined the Corinthian Colleges Board in January 2008.  Upon information and belief, Sullivan is a citizen of Virginia.

23.   Defendant Peter C. Waller ("Waller") was appointed to the Board in August 2008.  He is currently the Chief Executive Officer of the Company, a position he has held since July 2009.  He was also the Company's President and Chief Operating Officer from February 2006 to June 2009.  Upon information and belief, Waller is a citizen of California.  Corinthian Colleges paid Waller the following compensation:

| Year | Salary | Stock Awards | Option Awards | Incentive Plan Compensation | Other | Total |
| --- | --- | --- | --- | --- | --- | --- |
| 2010 | $650,000 | $719,989 | $1,526,449 | $1,495,000 | $72,444 | $4,463,882 |
| 2009 | $494,000 | $0 | $452,557 | $988,000 | $50,062 | $1,984,619 |
| 2008 | $475,000 | $239,900 | $387,667 | $577,917 | $30,368 | $1,710,852 |

24.   Defendant Matthew A. Ouimet ("Ouimet") has been the Company's President and Chief Operating Officer since July 2009.  He joined the Company in January 2009 as Executive Vice President of Operations.  Upon information and belief, Ouimet is a citizen of California.  Corinthian Colleges paid Ouimet the following compensation:

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

| Year | Salary | Stock Awards | Option Awards | Incentive Plan Compensation | Other | Total |
|------|--------|--------------|---------------|----------------------------|-------|-------|
| 2010 | $450,000 | $202,490 | $429,311 | $900,000 | $39,737 | $2,021,538 |
| 2009 | $197,308 | $235,500 | $514,122 | $337,500 | $122,382 | $1,406,812 |

25.    Defendant Kenneth S. Ord ("Ord") has been the Company's Executive Vice President and Chief Financial Officer since February 2005.   Upon information and belief, Ord is a citizen of California.   Corinthian Colleges paid Ord the following compensation:

| Year | Salary | Stock Awards | Option Awards | Incentive Plan Compensation | Other | Total |
|------|--------|--------------|---------------|----------------------------|-------|-------|
| 2010 | $442,000 | $152,479 | $323,286 | $663,000 | $24,764 | $1,605,529 |
| 2009 | $442,000 | $0 | $339,418 | $663,000 | $28,210 | $1,472,628 |
| 2008 | $425,000 | $179,925 | $290,750 | $387,813 | $26,251 | $1,309,739 |

26.    Massimino, St. Pierre, Adler, Dionisio, Hartshorn, Kane, Lee, Skladany, Sullivan, and Waller are sometimes referred to herein as the "Director Defendants."

27.    Massimino, Waller, Ouimet, and Ord are sometimes referred to herein as the "Officer Defendants."

28.    Adler, Hartshorn, Lee, and Dionisio are sometimes referred to herein as the "Audit Committee Defendants."

29.    The Director Defendants, the Officer Defendants, and the Audit Committee Defendants are sometimes referred to as the "Individual Defendants."

30.    The true names and capacities of Defendants sued herein as Does 1 through 25, inclusive, are presently not known to Plaintiff, who therefore sues these Defendants by such fictitious names.  Plaintiff will seek to amend this Complaint pursuant to Federal Rule of Civil Procedure 15 and include these Doe Defendants' true names and capacities when they are ascertained.  Each of the fictitiously named Defendants is responsible in

6

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

1  some manner for the conduct alleged herein and for the injuries suffered by Corinthian

2  Colleges as a result of Defendants' wanton and illegal conduct.

3  **IV.    DUTIES OF THE INDIVIDUAL DEFENDANTS**

4     **A.    Fiduciary Duties**

5       31.    By reason of their positions as officers, directors and/or fiduciaries of

6  Corinthian Colleges and because of their ability to control the business and corporate

7  affairs of Corinthian Colleges, the Individual Defendants owed the Company and its

8  shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were

9  and are required to use their utmost ability to control and manage Corinthian Colleges in

10  a fair, just, honest, and equitable manner.   The Individual Defendants were and are

11  required to act in furtherance of the best interests of Corinthian Colleges and its

12  shareholders so as to benefit all shareholders equally and not in furtherance of their

13  personal interest or benefit.

14       32.    Each director and officer of the Company owes to Corinthian Colleges and

15  its shareholders the fiduciary duty to exercise good faith and diligence in the

16  administration of the affairs of the Company and in the use and preservation of its

17  property and assets, and the highest obligations of fair dealing.   In addition, as officers

18  and/or directors of a publicly held company, the Individual Defendants had a duty to

19  promptly disseminate accurate and truthful information with regard to the Company's

20  operations, performance, management, projections, and forecasts so that the market price

21  of the Company's stock would be based on truthful and accurate information.

22     **B.    Audit Committee Duties**

23       33.    In addition to these duties, the Audit Committee Defendants owed specific

24  duties to Corinthian Colleges under the Audit Committee's Charter to review and

25  approve quarterly and annual financial statements, earnings press releases, and to ensure

26  that the Company had appropriate and effective internal controls over financial

27  reporting.   The Audit Committee met six times during the fiscal year ended June 30,

28  2010. In particular, the Audit Committee's Charter provided as follows:

The primary function and purpose of the Audit Committee (sometimes referred to herein as the "Committee") shall be to assist the Board of Directors (the "Board") of Corinthian Colleges, Inc. (this "Corporation") in fulfilling its oversight responsibilities by reviewing and providing direction on the following matters:

> (1) The financial reports and other financial information provided by the Corporation to any governmental body or the public;

> (2) This Corporation's systems of internal controls regarding finance, accounting, legal compliance and ethics that management and the Board have established; and

> (3) This Corporation's auditing, accounting and financial reporting processes generally.

*     *     *

*Documents/Reports Review*

(1) Review this Charter at least annually, and update the Charter as conditions dictate.

(2) Review the regular internal reports to management prepared by the internal auditing department and management's response.

(3) Review with financial management and the independent accountants the financial information to be included in any Forms 10-K and 10-Q prior to their filing or prior to the release of earnings.

*     *     *

*Financial Reporting Processes*

(11) In consultation with the independent accountants and the internal auditors, review the integrity of the organization's financial reporting processes, both internal and external.

(12) Consider the independent accountants' judgments about the quality and appropriateness of the Corporation's accounting principles as applied in its financial reporting.

(13) Consider and approve, if appropriate, major changes to the Corporation's auditing and accounting principles and practice as suggested by the independent accountants, management, or the internal auditing department.

*     *     *

*Ethical and Legal Compliance*

(18) Establish, review and update periodically a Code of Ethics for senior financial officers as required by any rules adopted by the Securities and Exchange Commission pursuant to the

8

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

Sarbanes-Oxley Act of 2002, and ensure that management has established a system to enforce this Code.

(19) Review management's monitoring of the Corporation's compliance with the Corporation's Code of Ethics, and ensure that management has the proper review system in place to ensure that Corporation's financial statements, reports and other financial information disseminated to governmental organizations, and the public satisfy legal requirements.

(20) Review, with the organization's counsel, any legal matter that could have a significant impact on the organization's financial statements.

(21) Establish procedures for (i) the receipt, retention, and treatment of complaints received by the Corporation regarding accounting, internal accounting controls, or auditing matters, and (ii) the confidential, anonymous submission by employees of the Corporation of concerns regarding questionable accounting or auditing matters.

(22) Conduct an appropriate review of all proposed related person transactions (which term refers to transactions that would be required to be disclosed pursuant to SEC Regulation S-K, Item 404(a)). Management shall not cause the Corporation to enter into any new related person transaction unless the Committee approves such transaction.

(23) Perform any other activities consistent with this Charter, the Corporation's By-laws and governing law, as the Committee or the Board deems necessary or appropriate.

**C.     Control, Access, and Authority**

34.    The Individual Defendants, because of their positions of control and authority as directors and/or officers of Corinthian Colleges, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by Corinthian Colleges.

35.    Because of their advisory, executive, managerial, and directorial positions with Corinthian Colleges, each of the Individual Defendants had access to adverse, non-public information about the financial condition, operations, and improper representations of Corinthian Colleges, including information regarding the student admissions rate and future growth rate.

36.     At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of Corinthian Colleges, and was at all times acting within the course and scope of such agency.

**D.      Reasonable and Prudent Supervision**

37.     To discharge their duties, the officers and directors of Corinthian Colleges were required to exercise reasonable and prudent supervision over the management, policies, practices and internal controls of the Company.  By virtue of such duties, the officers and directors of Corinthian Colleges were required to, among other things:

(a)     refrain from acting upon material inside corporate information to benefit themselves;

(b)     ensure that the Company complied with its legal obligations and requirements, including acting only within the scope of its legal authority and disseminating truthful and accurate statements to the investing public;

(c)     conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(d)     properly and accurately guide investors and analysts as to the true financial condition of the Company at any given time, including making accurate statements about the Company's financial results;

(e)     remain informed as to how Corinthian Colleges conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, make reasonable inquiry in connection therewith, and take steps to correct such conditions or practices and make such disclosures as necessary to comply with securities laws; and

(f)     ensure that Corinthian Colleges was operated in a diligent, honest, and prudent manner in compliance with all applicable laws, rules, and regulations.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

## V.     BREACHES OF DUTIES

38.     Each Individual Defendant, by virtue of his or her position as a director and/or officer, owed to Corinthian Colleges and to its shareholders the fiduciary duty of loyalty and good faith and the exercise of due care and diligence in the management and administration of the affairs of Corinthian Colleges, as well as in the use and preservation of its property and assets.   The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of Corinthian Colleges, the absence of good faith on their part, and a reckless disregard for their duties to Corinthian Colleges and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to Corinthian Colleges.

39.     The Individual Defendants each breached their duty of loyalty and good faith by allowing Defendants to cause, or by themselves causing, the Company to make false and/or misleading statements and or failing to disclose: (1) the Company overstated its growth prospects by engaging in illegal and improper recruiting activities, which also artificially inflated the Company's reported results and future growth prospects; (2) the Company's financial results were overstated because the Company's colleges inflated tuition costs and its student loan repayment rates were well below levels required for participation in federal loan programs; (3) the Company failed to maintain adequate systems of internal operational and financial controls; and (4) the Individual Defendants lacked a basis for their positive statements about the Company's prospects and growth. In addition, as a result of the Individual Defendants' illegal actions and course of conduct, the Company is now the subject of class action lawsuits that allege violations of the federal securities laws.   As a result, Corinthian Colleges has expended, and will continue to expend, significant sums of money to rectify the Defendants' wrongdoing.

## VI.   CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

40.    In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their wrongdoing.  The Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

41.    During all times relevant hereto, the Individual Defendants collectively and individually initiated a course of conduct that was designed to and did conceal the fact that: (1) the Company overstated its growth prospects by engaging in illegal and improper recruiting activities, which also artificially inflated the Company's reported results and future growth prospects; (2) the Company's financial results were overstated because the Company's colleges inflated tuition costs and its student loan repayment rates were well below levels required for participation in federal loan programs; (3) the Company failed to maintain adequate systems of internal operational and financial controls; and (4) the Individual Defendants lacked a basis for their positive statements about the Company's prospects and growth.  In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein.

42.    The Individual Defendants engaged in a conspiracy, common enterprise, and/or common course of conduct.  During this time, the Individual Defendants caused the Company to issue false financial results based upon inflated tuition costs and student loan repayment rates that were well below levels required for participation in federal loan programs.

43.    The purpose and effect of the Individual Defendants' conspiracy, common enterprise, and/or common course of conduct was, among other things, to: (i) disguise the Individual Defendants' violations of law, including breaches of fiduciary duty and

12

1 | unjust enrichment; and (ii) disguise and misrepresent the Company's future business
2 | prospects.

3 | 44.   The Individual Defendants accomplished their conspiracy, common
4 | enterprise, and/or common course of conduct by causing the Company to purposefully,
5 | recklessly, or negligently release improper statements.  Because the actions described
6 | herein occurred under the authority of the Board, each of the Individual Defendants was
7 | a direct, necessary, and substantial participant in the conspiracy, common enterprise,
8 | and/or common course of conduct complained of herein.

9 | 45.   Each of the Individual Defendants aided and abetted and rendered
10 | substantial assistance in the wrongs complained of herein.  In taking such actions to
11 | substantially assist the commissions of the wrongdoing complained of herein, each
12 | Individual Defendant acted with knowledge of the primary wrongdoing, substantially
13 | assisted the accomplishment of that wrongdoing, and was aware of his or her overall
14 | contribution to and furtherance of the wrongdoing.

15 | **VII.   SUBSTANTIVE ALLEGATIONS**

16 | **A.   Background**

17 | 46.   Corinthian Colleges was founded in 1995 and completed its initial public
18 | offering in 1999.  Corinthian Colleges is a private, for-profit post-secondary education
19 | company operating in the United States and Canada.  As of June 30, 2010, Corinthian
20 | Colleges had more than 110,500 students, and 15,900 employees, including 5,600 full-
21 | time and part-time faculty members. The Company offers a variety of diploma programs
22 | and associates, bachelors, and master's degrees for occupations in demand.   The
23 | Company's training program areas include healthcare, criminal justice, business,
24 | information technology, transportation technology and maintenance, and construction
25 | trades.   The Company also offers online degree programs that include business,
26 | accounting, criminal justice, paralegal, and information technology.

27

28

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

**B.    The Individual Defendants Caused the Company to Issue False and Misleading Statements**

47.    On October 30, 2007, the Individual Defendants caused the Company to issue a press release announcing its financial results for the first quarter ended September 30, 2007. The Company reported net revenues of $247.5 million, compared to $222.1 million in the same period of the prior year. The Company also reported net income of $1.95 million, or $0.02 per diluted share, compared to net income of $1.4 million, or $0.02 per diluted share in the same period of the prior year.

48.    In the press release, Defendant Massimino represented the following:

> Our company-wide initiatives to revitalize growth and improve service to students are beginning to produce results.... In particular, more effective advertisements, brand consolidation, and a shift toward national advertising helped generate positive growth over the past several months. *In the first quarter, new student growth increased 13%, and we expect growth of 8% - 9% in fiscal 2008. Over time, we believe that a higher student population will allow us to achieve greater economies of scale, improve facility utilization, and expand margins.*

49.    These statements were false and misleading because the Defendants failed to disclose that the Company overstated its growth prospects by engaging in illicit and improper recruiting activities such as (i) employing deceptive marketing tactics by refusing to disclose total tuition costs to prospective students before signing a binding agreement; (ii) lying about accreditation; (iii) enticing students to take out student loans even when the applicant had substantial savings which were sufficient to pay the tuition; (iv) misrepresenting extravagant and unlikely high salaries to students in their chosen profession once they graduated; (v) failing to disclose graduation rates; and (vi) offering tuition costs equivalent to 9 months of credit hours per year, when total program length was 12 months. These improper recruiting activities had the effect of artificially

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

increasing student enrollment and thus artificially inflating the Company's reported results and future growth prospects.

50.   On January 29, 2008, the Individual Defendants caused the Company to issue a press release announcing its financial results for the second quarter ended December 31, 2007. The Company reported net revenue of $272.6 million, compared to $235.1 million in the same period of the prior year. The Company further reported net income of $8.11 million, or $0.10 per diluted share for the quarter, compared to net income of $2.58 million, or $0.03 per diluted share in the same period of the prior year.

51.   In the press release, Defendant Massimino represented the following:

> In the second quarter we continued our positive growth trend, *posting a 10% increase in new student starts.... More effective marketing, coupled with higher employee retention and continued improvement in other key business processes, has helped generate enrollment growth over the past three quarters. We expect that growth to continue in the second half of the fiscal year.*

52.   These statements were false and misleading because the Defendants failed to disclose that the Company overstated its growth prospects by engaging in illicit and improper recruiting activities such as (i) employing deceptive marketing tactics by refusing to disclose total tuition costs to prospective students before signing a binding agreement; (ii) lying about accreditation; (iii) enticing students to take out student loans even when the applicant had substantial savings which were sufficient to pay the tuition; (iv) misrepresenting extravagant and unlikely high salaries to students in their chosen profession once they graduated; (v) failing to disclose graduation rates; and (vi) offering tuition costs equivalent to 9 months of credit hours per year, when total program length was 12 months. These improper recruiting activities had the effect of artificially increasing student enrollment and thus artificially inflating the Company's reported results and future growth prospects.

53.   On April 30, 2008, the Individual Defendants caused the Company to issue a press release announcing its financial results for the third quarter ended March 31, 2008.   The Company reported net revenue of $281.5 million, compared to $241.1 million in the same period of the prior year.  The Company further reported net income of $11.82 million, or $0.14 per diluted share for the quarter, compared to net income of $12 million, or $0.14 per diluted share in the same period of the prior year.

54.   In the press release, Defendant Massimino represented the following:

> In the third quarter we continued our positive growth trend, *posting a 13.3% increase in new student starts....* Growth was broad-based across our U.S. operations, both ground schools and online. *More effective marketing, coupled with higher employee retention, better service to students and continued operational improvements, has helped generate strong enrollment growth over the past four quarters.*

55.   These statements were false and misleading because the Defendants failed to disclose that the Company overstated its growth prospects by engaging in illicit and improper recruiting activities such as (i) employing deceptive marketing tactics by refusing to disclose total tuition costs to prospective students before signing a binding agreement; (ii) lying about accreditation; (iii) enticing students to take out student loans even when the applicant had substantial savings which were sufficient to pay the tuition; (iv) misrepresenting extravagant and unlikely high salaries to students in their chosen profession once they graduated; (v) failing to disclose graduation rates; and (vi) offering tuition costs equivalent to 9 months of credit hours per year, when total program length was 12 months.   These improper recruiting activities had the effect of artificially increasing student enrollment and thus artificially inflating the Company's reported results and future growth prospects.

56.   On August 26, 2008, the Individual Defendants caused the Company to issue a press release announcing its financial results for the fourth quarter and year ended

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

1  June 30, 2008.  The Company reported net revenue of $274 million, compared to $231.6

2  million in the same period of the prior year.  The Company further reported net loss of

3  $0.62 million, or $0.10 per diluted share for the quarter, compared to the net loss of

4  $8.76 million, or $0.10 per diluted share in the same period of the prior year.  For the

5  year, the Company reported net revenue of $1.069 billion, compared to $919.2 million in

6  the previous year.  The Company further reported net income of 21.27 million, or $0.25

7  per diluted share for the year, compared to $7.23 million, or $0.08 per diluted share in

8  the previous year.

9      57.    In the press release, Defendant Massimino represented the following:

10          *Over the past three fiscal years, we have implemented*

11  *several companywide initiatives to revitalize growth and*
*improve service to students....  These initiatives, which*

12  *focus on employee retention and development, marketing,*

13  *regulatory compliance, and other key operational*
*processes, are producing tangible results.*  For continuing

14  operations, we generated new student growth of 13.0% in

15  fiscal 2008 and began to improve operating margins.  In
fiscal 2009, we believe higher enrollment will allow us to

16  achieve greater economies of scale, improve facility
utilization, and further expand margins.

17

18      58.    These statements were false and misleading because the Defendants failed

19  to disclose that the Company overstated its growth prospects by engaging in illicit and

20  improper recruiting activities such as (i) employing deceptive marketing tactics by

21  refusing to disclose total tuition costs to prospective students before signing a binding

22  agreement; (ii) lying about accreditation; (iii) enticing students to take out student loans

23  even when the applicant had substantial savings which were sufficient to pay the tuition;

24  (iv) misrepresenting extravagant and unlikely high salaries to students in their chosen

25  profession once they graduated; (v) failing to disclose graduation rates; and (vi) offering

26  tuition costs equivalent to 9 months of credit hours per year, when total program length

27  was 12 months.  These improper recruiting activities had the effect of artificially

28

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

1  increasing student enrollment and thus artificially inflating the Company's reported
2  results and future growth prospects.

3       59.  On August 29, 2008, the Company filed its annual report with the SEC on a
4  Form 10-K for the year ended June 30, 2008, which was signed by Defendants
5  Massimino, Ord and Waller. Defendants Massimino and Ord also provided signed
6  certifications stating that the Form 10-K did not contain any material misrepresentations
7  and that the Company maintained appropriate and effective internal controls. Moreover,
8  Defendants Adler, Hartshorn, Lee, and Dionisio reviewed and approved the 10-K prior
9  to the time it was issued. Indeed, they are specifically required to do so as members of
10  the Audit Committee. The Charter of the Audit Committee requires the members of the
11  Committee to "review with financial management and the independent accountants the
12  financial information to be included in any Forms 10-K and 10-Q prior to their filing or
13  prior to the release of earnings."

14       60.  The Form 10-K represented the following in relevant parts:

15  **Admissions**

16  As of June 30, 2008, we employed approximately 1,400
   admissions representatives who work directly with
17  prospective students to facilitate the admissions process.
   These representatives interview and advise students
18  interested in specific careers and are a key component of
19  our effort to generate interest in our educational services.
   We conduct quarterly student satisfaction surveys at our
20  campuses in the United States in which students have
   consistently given high marks to our admissions personnel
21  for helpfulness, courtesy and accuracy of information.
22  Because our success is highly dependent on the efficiency
   and effectiveness of our admissions process, we invest
23  considerable resources to train our admissions
   representatives in product knowledge, regulatory
24  compliance, and customer service. We also employ various
25  admissions supervisory and monitoring programs, and
   conduct student surveys which help us ensure compliance
26  with both government regulations and our corporate
   policies.
27

28  One of our objectives in the admissions process is to

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

identify students who have the ability to succeed in our schools. The majority of prospective students must pass a standardized admissions test. Most of our colleges in the United States accept non-high school graduates who can demonstrate an ability to benefit ("ATB students") from the program by passing certain tests which are required by the ED. We believe that ATB students can successfully complete many of our diploma programs and our colleges have demonstrated success in graduating and placing these students over the years. As of June 30, 2008, ATB students accounted for approximately 21.5% of total enrollments in our U.S. schools.

\* \* \*

*Cohort Default Rates.* A significant requirement imposed by Congress is a limitation on participation in the Title IV Programs by institutions whose former students defaulted on the repayment of federally guaranteed or funded student loans at an "excessive" rate ("Cohort Default Rates"). **Many institutions, including all of our institutions within the U.S., have responded by implementing aggressive student loan default management programs aimed at reducing the likelihood of students failing to repay their federally guaranteed loans in a timely manner ....**

\* \* \*

**We proactively manage our students' repayment obligations and have engaged a professional default management firm to assist us in managing the Cohort Default Rates at our U.S. institutions.** We believe that professional default management services can continue to assist us in managing these Cohort Default Rates.

\* \* \*

**In addition to the efforts of our outside professional default management firm, each of our colleges has adopted an internal student loan default management plan.** Those plans emphasize to students the importance of meeting loan repayment requirements and provide for extensive loan counseling, along with methods to increase student persistence and completion rates and graduate employment (placement) rates. Immediately upon a

19

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

> student's cessation of enrollment, the professional default
> management firm initiates regular contact with the student,
> maintains regular contact throughout the grace period, and
> continues this activity through the entire cohort period.
> The colleges continue to work with the default management
> firm to maintain accurate and up-to-date information on
> address changes, marital status changes, or changes in
> circumstances that may allow the student to apply for
> deferments. These activities are all in addition to the loan
> servicing and collection activities of FFEL lenders and
> guarantee agencies.

61.   These statements were false and misleading for the reasons stated in ¶52, and also because they failed to disclose that the Company's student loan repayment rates were well below levels required for participation in federal programs.

62.   On November 5, 2008, the Individual Defendants caused the Company to issue a press release announcing its financial results for the first quarter ended September 30, 2008. The Company reported net revenue of $289.6 million, compared to $247.5 million in the same period of the prior year. The Company also reported net income of $5.49 million, or $0.06 per diluted share, compared to net income of $1.95 million, or $0.02 per diluted share in the same period of the prior year.

63.   In the press release, Defendant Massimino stated the following:

> *The first quarter marked our tenth consecutive quarter of start growth in continuing operations, primarily driven by our on-going initiatives to improve marketing and operational effectiveness.... Our end-of quarter student population increased 11.3% over September 30 last year, and we believe continued growth will allow us to leverage fixed expenses and increase operating margins over time.*

64.   These statements were false and misleading because the Defendants failed to disclose that the Company overstated its growth prospects by engaging in illicit and improper recruiting activities such as (i) employing deceptive marketing tactics by refusing to disclose total tuition costs to prospective students before signing a binding agreement; (ii) lying about accreditation; (iii) enticing students to take out student loans even when the applicant had substantial savings which were sufficient to pay the tuition;

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

(iv) misrepresenting extravagant and unlikely high salaries to students in their chosen profession once they graduated; (v) failing to disclose graduation rates; and (vi) offering tuition costs equivalent to 9 months of credit hours per year, when total program length was 12 months.  Additionally, this statement was false and misleading because it failed to disclose that the Company did not maintain effective and appropriate internal controls.

65.   On February 3, 2009, the Individual Defendants caused the Company to issue a press release announcing its financial results for the second quarter ended December 31, 2008.  The Company reported net revenue of $310.5 million, compared to $270.3 million in the same period of the prior year.  The Company also reported net income of $15.09 million, or $0.18 per diluted share, compared to the net income of $8.11 million, or $0.10 per diluted share in the same period of the prior year.

66.   In the press release, Defendant Massimino stated the following:

> Our strong second quarter reflects our continued focus on fundamentals - hiring, developing and retaining the best employees, growing enrollment, improving student outcomes, strengthening business processes, and increasing marketing effectiveness.... *We have reported increased start growth for eleven consecutive quarters, and the resulting rise in student population is leveraging fixed costs*.  In addition, our marketing initiatives continue to produce an increased number of quality leads at a lower cost. *We achieved significant operating margin expansion in the quarter and remain on track to meet or exceed our three-year financial goals*.

67.   This statement was false and misleading when made for the reasons set forth in ¶¶52, 55, 58, and 64, and because Defendants failed to disclose that the Company's increased margins were generated by improper marketing methods, obtaining federal funds for its students through material misrepresentations of its Cohort Default Rates.

68.   On April 30, 2009, the Individual Defendants caused the Company to issue a press release announcing its financial results for the third quarter ended March 31, 2009.  The Company reported net revenue of $346.4 million, compared to $279.9

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

million in the same period of the prior year. The Company also reported net income of $15.08 million, or $0.18 per diluted share, compared to net income of $8.11 million, or $0.10 per diluted share in the same period of the prior year.

69.   In the press release, Defendant Massimino stated the following:

> Our strong third quarter results reflect the continued progress of our business initiatives as well as some favorable impact from the recession.... *We have now reported increased start growth for twelve consecutive quarters, and the resulting rise in student population is leveraging fixed costs.* In addition, increased marketing effectiveness and lower advertising costs are producing higher quality, less expensive leads. Given all of these factors, *we achieved significant operating margin expansion in the quarter and raised earnings guidance for the balance of the fiscal year.*

70.   This statement was false and misleading when made for the reasons set forth in ¶¶52, 55, 58, and 64, and because Defendants failed to disclose that the Company's increased margins were generated by improper marketing methods, obtaining federal funds for its students through material misrepresentations of its Cohort Default Rates.

71.   On August 25, 2009, the Individual Defendants caused the Company to issue a press release announcing its financial results for the fourth quarter and year ended June 30, 2009. The Company reported net revenue of $353.5 million, compared to $274 million in the same period of the prior year. The Company further reported net income of $23.19 million, or $0.27 per diluted share for the quarter, compared to net loss of $0.62 million, or $0.01 per diluted share in the same period of the prior year. For the year, the Company reported net revenue of $1.31 billion, compared to $1.07 billion in the previous year. The Company further reported net income of $68.76 million, or $0.80 per diluted share for the year, compared to $21.27 million, or $0.25 per diluted share in the previous year.

72.   In the press release, Defendant Waller stated the following:

> Our strong fourth quarter and fiscal year results reflect the

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

> continued progress of our initiatives to improve the student experience and increase top and bottom line growth.... *We have successfully increased our student population for three consecutive years*, and during fiscal 2009, the recession helped increase our growth momentum. *The higher student population has resulted in improved leverage of facility and other fixed costs*. Increased advertising effectiveness and lower media costs have improved efficiencies in marketing and admissions. Given all of these factors, *our operating margin and cash flow increased substantially in fiscal 2009, and we expect continued improvement in the current fiscal year.*

73.     This statement was false and misleading when made for the reasons set forth in ¶¶52, 55, 58, and 64, and because Defendants failed to disclose that the Company's increased margins were generated by improper marketing methods, obtaining federal funds for its students through material misrepresentations of its Cohort Default Rates.

74.     On August 26, 2009, the Company filed its annual report on a Form 10-K for the year ended June 30, 2009 with the SEC, which was signed by Defendants Massimino, Ord and Waller.   Defendants Waller and Ord also provided signed certifications stating that the Form 10-K did not contain any material misrepresentations and that the Company maintained appropriate and effective internal controls. Moreover, Defendants Adler, Hartshorn, Lee, and Dionisio reviewed and approved the 10-K prior to the time it was issued.   Indeed, they are specifically required to do so as members of the Audit Committee. The Charter of the Audit Committee requires the members of the Committee to "review with financial management and the independent accountants the financial information to be included in any Forms 10-K and 10-Q prior to their filing or prior to the release of earnings."

75.     The Form 10-K represented the following in relevant parts:

**Admissions**

As of June 30, 2009, we employed approximately 1,700 admissions representatives who work directly with prospective students to facilitate the admissions process.

These representatives interview and advise students interested in specific careers and are a key component of our effort to generate interest in our educational services. We conduct semi-annual student satisfaction surveys at our campuses in the United States in which students have consistently given high marks to our admissions personnel for helpfulness, courtesy and accuracy of information. Because our success is highly dependent on the efficiency and effectiveness of our admissions process, we invest considerable resources to train our admissions representatives in product knowledge, regulatory compliance, and customer service. We also employ various admissions supervisory and monitoring programs, and conduct student surveys which help us ensure compliance with both government regulations and our corporate policies.

One of our objectives in the admissions process is to identify students who have the ability to succeed in our schools. The majority of prospective students must pass a standardized admissions test. Most of our colleges in the United States accept non-high school graduates who can demonstrate an ability to benefit ("ATB students") from the program by passing certain tests which are required by the ED. We believe that ATB students can successfully complete many of our diploma programs and our colleges have demonstrated success in graduating and placing these students over the years. As of June 30, 2009, ATB students accounted for approximately 23.8% of total enrollments in our U.S. schools.

\* \* \*

*Cohort Default Rates.* A significant requirement imposed by Congress is a limitation on participation in the Title IV Programs by institutions whose former students defaulted on the repayment of federally guaranteed or funded student loans at an "excessive" rate ("Cohort Default Rates"). **Many institutions, including all of our institutions within the U.S., have responded by implementing aggressive student loan default management programs aimed at reducing the likelihood of students failing to repay their federally guaranteed loans in a timely manner ....**

**We monitor our students' repayment obligations and have engaged a professional default management firm**

24

**to assist us in managing the Cohort Default Rates at our U.S. institutions.** We believe that professional default management services can continue to assist us in managing these Cohort Default Rates.

\* \* \*

**In addition to the efforts of our outside professional default management firm, each of our campuses has adopted an internal student loan default management plan.** Those plans emphasize to students the importance of meeting loan repayment requirements and provide for extensive loan counseling, along with methods to increase student persistence and completion rates and graduate employment (placement) rates. The professional default management firm initiates regular contact with the student upon receipt of delinquency notification from the guarantee agencies and continues this activity through the entire cohort period. The colleges continue to work with the default management firm to maintain accurate and up-to-date information on address changes, marital status changes, or changes in circumstance that may allow the student to apply for deferments. These activities are all in addition to the loan servicing and collection activities of FFEL lenders and guarantee agencies.

76. On October 29, 2009, the Individual Defendants caused the Company to issue a press release announcing its financial results for the first quarter ended September 30, 2009. The Company reported net revenue of $388.5 million, compared to $289.6 million in the same period for the prior year. The Company also reported net income of $32.91 million, or $0.37 per diluted share, compared to the net income of $5.49 million, or $0.06 per diluted share in the same period of the prior year.

77. In the press release, Defendant Waller stated the following:

Our strong first quarter results primarily reflect the continued success of our initiatives to enhance the student experience and improve operational performance.... **We have increased our student population for more than three consecutive fiscal years, resulting in improved leverage of facility and other fixed costs.** Increased advertising effectiveness and lower media costs have improved efficiencies in marketing and admissions.

25

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

78.     On October 30, 2009, the Company filed its quarterly report on a Form 10-Q for the first quarter ended September 30, 2009 with the SEC, which was signed by Defendants Waller and Ord.   Defendants Waller and Ord also provided signed certifications stating that the Form 10-Q did not contain any material misrepresentations and that the Company maintained appropriate and effective internal controls. Moreover, Defendants Adler, Hartshorn, Lee, and Dionisio reviewed and approved the 10-Q prior to the time it was issued.  Indeed, they are specifically required to do so as members of the Audit Committee.  The Charter of the Audit Committee requires the members of the Committee to "review with financial management and the independent accountants the financial information to be included in any Forms 10-K and 10-Q prior to their filing or prior to the release of earnings."

79.     The Form 10-Q represented the following in relevant parts:

> Under the HEA, an institution could lose its eligibility to participate in some or all of the federal student financial aid programs if defaults by its former students on their federally guaranteed student loans funded by third parties equal or exceed 25% per year for three consecutive years. ED generally publishes draft cohort default rates in February of each year for the repayment period that ended the prior September 30.  On that schedule, the Company expects ED to publish draft cohort default rates for the students who entered repayment between October 1, 2007 and September 30, 2008 (the "2008 Cohort") in February 2010. **The Company monitors on an ongoing basis the preliminary data about cohorts which are in the process of repayment.**
>
> Although the draft cohort default rates for the 2008 Cohort will not be available until February 2010, the measurement period for that cohort has now ended and the guaranty agencies have gathered preliminary data for submission to ED.  **Those preliminary data show the negative impact of the ongoing recession on the 2008 Cohort.  Given the data the Company has received thus far, we expect ten to twelve of our "institutions" to exceed the 25% limitation for the 2008 Cohort, but we do not expect any of these institutions to exceed the threshold for three consecutive years.**  The preliminary data also show another

26

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

five of our "institutions" could exceed this limitation, although the Company will not know the outcome for these institutions until draft rates are published in February 2010. The term "institution" means a main campus and its additional locations, as defined under ED regulations. The Company has a total of forty institutions, many of which include additional locations.

The HEA is required to be reauthorized on a periodic basis, which most recently occurred in August 2008. The 2008 reauthorization of the HEA, called the Higher Education Opportunity Act ("HEOA"), made significant changes to the requirements governing the Title IV Programs, including the provisions on cohort default rates. Under the HEOA, a separate calculation will be performed that will add an additional federal fiscal year of borrowers' repayment performance starting with the Cohort that enters repayment between October 1, 2008 and September 30, 2009. After three years of Cohort Default Rates calculated with the additional federal fiscal year are available, sanctions will be imposed if an institution has a Cohort Default Rate, under the new calculation, of more than 30% for three consecutive federal fiscal years. We review all annually published Cohort Default Rates and appeal the rates we believe are inaccurate. If any of our institutions, depending on its size, were to lose eligibility to participate in federal student financial aid programs because of high student loan default rates, it could have a material adverse effect on our business.

80.   The statements in ¶¶75, 76, and 79 were false and misleading for the reasons specified in ¶¶52, 55, 58 and 64, and because they understated the number of institutions that exceeded the Cohort Default Rate.  Further, these statements were false and misleading because the Individual Defendants knew that the Cohort Default Rates would worsen and that the Company faced a significant risk of exceeding the Cohort Default Rate threshold for three consecutive years.

81.   On February 2, 2010, the Individual Defendants caused the Company to issue a press release announcing its financial results for the second quarter ended December 31, 2009.  The Company reported net revenue of $414.3 million, compared to $318.3 million in the same period of the prior year.  The Company also reported net

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT