1  income of $39.4 million, or $0.44 per diluted share, compared to net income of $15.5

2  million, or $0.18 per diluted share in the same period of the prior year.

3      82.    In the press release, Defendant Waller represented the following:

4  > *The continued growth in student population has resulted in*
> *improved leverage of facility expenses and other fixed*
5  > *costs....* In addition, marketing and bad debt expenses
> continued to decline as a percent of revenue. Given all of
6  > these factors, our operating margin and cash flow from
> operations improved substantially compared with the prior
7  > year. We achieved these results while continuing to make
> substantial investments in graduate employment services
8  > and student loan default management.
9

10      83.    On February 4, 2010, the Company filed its quarterly report on a Form 10-

11  Q for the second quarter ended December 31, 2009 with the SEC, which was signed by

12  Defendants Waller and Ord.  Defendants Waller and Ord also provided signed

13  certifications stating that the Form 10-Q did not contain any material misrepresentations

14  and that the Company maintained appropriate and effective internal controls. Moreover,

15  Defendants Adler, Hartshorn, Lee, and Dionisio reviewed and approved the 10-Q prior

16  to the time it was issued.  Indeed, they are specifically required to do so as members of

17  the Audit Committee. The Charter of the Audit Committee requires the members of the

18  Committee to "review with financial management and the independent accountants the

19  financial information to be included in any Forms 10-K and 10-Q prior to their filing or

20  prior to the release of earnings."

21      84.    The Form 10-Q represented the following in relevant parts:

22  > Under the HEA, an institution could lose its eligibility to
> participate in some or all of the federal student financial aid
23  > programs if defaults by its former students on their
> federally guaranteed student loans funded by third parties
24  > equal or exceed 25% per year for three consecutive years.
> ED generally publishes draft cohort default rates in
25  > February of each year for the repayment period that ended
> the prior September 30. On that schedule, the Company
26  > expects ED to publish draft cohort default rates for the
> students who entered repayment between October 1, 2007
27  > and September 30, 2008 (the "2008 Cohort") in February
28

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

2010.  **The Company monitors on an ongoing basis the preliminary data about cohorts which are in the process of repayment.**

Although the draft cohort default rates for the 2008 Cohort will not be available until February 2010, the measurement period for that cohort has ended and the guaranty agencies have submitted preliminary data to ED.  Those preliminary data show the negative impact of the ongoing recession on the 2008 Cohort.  In our report on form 10Q for the quarter ended September 30, 2009 we stated our belief that given the data the Company had received thus far, we expected ten to twelve of our "institutions" to exceed the 25% limitation for the 2008 Cohort, but we did not expect any of these institutions to exceed the threshold for three consecutive years.  In that same report, we also stated that preliminary data indicated another five of our "institutions" could exceed this limitation, although the Company would not know the outcome for these institutions until draft rates are published in February 2010.  During the quarter ended December 31, 2009, we continued to refine our analysis of the available data for the 2008 Cohort. Based on that analysis, **we do not believe that the number of institutions expected to be above the 25% threshold for the 2008 Cohort has deteriorated since we provided our preliminary expectations in the Report on Form 10-Q for the quarter ended September 30, 2009.** When ED provides us with draft data for the 2008 Cohort, we expect to file a Report on Form 8-K with updated information. The term "institution" means a main campus and its additional locations, as defined under ED regulations. The Company has a total of forty institutions, many of which include additional locations.

The HEA is required to be reauthorized on a periodic basis, which most recently occurred in August 2008.  The 2008 reauthorization of the HEA, called the Higher Education Opportunity Act ("HEOA"), made significant changes to the requirements governing the Title IV Programs, including the provisions on cohort default rates.  Under the HEOA, a separate calculation will be performed that will add an additional federal fiscal year of borrowers' repayment performance starting with the Cohort that enters repayment between October 1, 2008 and September 30, 2009. After three years of Cohort Default Rates calculated with the additional federal fiscal year are available,

29

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

1
2
3
4
5
6

sanctions will be imposed if an institution has a Cohort Default Rate, under the new calculation, of 30% or more for three consecutive federal fiscal years. We review all annually published Cohort Default Rates and appeal the rates we believe are inaccurate. If any of our institutions, depending on its size, were to lose eligibility to participate in federal student financial aid programs because of high student loan default rates, it could have a material adverse effect on our business.

7
8
9
10
11
12

85.     The statements in ¶¶81 and 83 were false and misleading because they understated the number of institutions that exceeded the Cohort Default Rate. Further, these statements were false and misleading because the Individual Defendants knew that the Cohort Default Rates would worsen and that many institutions faced a significant risk of exceeding the Cohort Default Rate threshold for three consecutive years.

13
14
15
16
17

86.     On May 4, 2010, the Individual Defendants caused the Company to issue a press release announcing its financial results for the third quarter ended March 31, 2010. The Company reported net revenue of $478.3 million, compared to $346.4 million in the same period of the prior year. The Company also reported net income of $39.8 million, or $0.45 per diluted share, compared to net income of $25.3 million, or $0.29 per diluted share in the same period of the prior year.

18
19
20
21
22
23
24

87.     In the press release, Defendant Waller represented the following:

*The continued growth in student population has resulted in improved leverage of facility expenses and other fixed costs....* In addition, marketing and bad debt expenses continued to decline as a percent of revenue. Given all of these factors, *our operating margin and cash flow from operations improved substantially compared with the prior year.* We achieved these results while continuing to make additional investments in graduate employment services and student loan default management.

25
26
27
28

88.     On May 4, 2010, the Company filed its quarterly report on a Form 10-Q for the second quarter ended March 31, 2010 with the SEC, which was signed by Defendants Waller and Ord.   Defendants Waller and Ord also provided signed

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

1  certifications stating that the Form 10-Q did not contain any material misrepresentations

2  and that the Company maintained appropriate and effective internal controls. Moreover,

3  Defendants Adler, Hartshorn, Lee, and Dionisio reviewed and approved the 10-Q prior

4  to the time it was issued. Indeed, they are specifically required to do so as members of

5  the Audit Committee. The Charter of the Audit Committee requires the members of the

6  Committee to "review with financial management and the independent accountants the

7  financial information to be included in any Forms 10-K and 10-Q prior to their filing or

8  prior to the release of earnings."

9      89.    The Form 10-Q represented the following in relevant parts:

10         Under the HEA, an institution could lose its eligibility to
           participate in some or all of the federal student financial aid
11         programs if defaults by its former students on their federal
           student loans equal or exceed 25% per year for three
12         consecutive years, or 40% in a single year. The term
           "institution" means a main campus and its additional
13         locations, as defined by ED's regulations. ED generally
           publishes draft cohort default rates in February of each year
14         for the repayment period that ended the prior September 30.
           We review all annually published cohort default rates and
15         appeal the rates we believe are inaccurate. Draft rates do
           not result in sanctions and can change between February
16         and the release of the official cohort default rates in
           September.
17
18

19         On February 9, 2010, we filed a Report on Form 8-K with
           the Securities and Exchange Commission in which we
20         reported the draft cohort default rates from ED for students
           of our institutions who entered repayment during the
21         federal fiscal year ended September 30, 2008 (the "2008
           Cohort"). Of our 49 total institutions, 9 institutions
22         exceeded the 25% threshold during the 2008 Cohort year,
           and no institutions exceeded the 40% threshold. The 2008
23         Cohort year was the first year in which any of our
           institutions exceeded the 25% threshold for any reporting
24         period.
25

26         **We monitor on an ongoing basis the preliminary data
           about cohorts which are in the process of repayment.**
27         We are currently monitoring the repayment and default
           status of our students who entered repayment during the
28

31

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

federal fiscal year ended September 30, 2009 (the "2009 Cohort"), and the federal fiscal year ending September 30, 2010 (the "2010 Cohort"). The draft cohort default rates for the 2009 Cohort will not be available until February 2011. **However, preliminary data show the negative impact of the ongoing recession for the students we serve on the 2009 Cohort. On a year-over-year basis, as of March 31 of the applicable year, the 2009 Cohort data show higher default rates than the 2008 Cohort data**.

**In order to improve our overall default rates, we have implemented a multi-faceted cohort default management program, which we believe is based upon industry best practices.** This program includes: a new contact management system to assist in reaching students who are no longer in school; an internal department focused primarily on early stage delinquencies; an expanded program of entrance and exit counseling and financial literacy training for current students; and the use of outside firms and internal resources to reach borrowers and assist them in contacting their lenders and getting help with alternatives to default, including income-based repayment, forbearance and deferral. These efforts are now fully operational, and are having positive effects. **While the overall default rates are higher for us on a company-wide basis in the 2009 Cohort versus the 2008 Cohort at the same time period, the rate of increase in defaults has begun to decelerate.** Our ability to maintain or improve our overall defaults compared to prior cohort years is substantially dependent on the continuing success of our cohort default management efforts. If we are able to maintain the success of these efforts, we do not expect any of our institutions to exceed the 25% threshold for three consecutive years, or the 40% threshold in any single year based on the current two year measurement period.

90.   The statements in ¶¶86 and 88 were false and misleading for the reasons specified in ¶¶52, 55, 58 and 64, and because they understated the number of institutions that exceeded the Cohort Default Rate. Further, these statements were false and misleading because the Individual Defendants knew that the Cohort Default Rates would

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

1 | worsen and that the Company faced a significant risk of exceeding the Cohort Default
2 | Rate threshold for three consecutive years.

3 | ### C.   The Truth Emerges

4 | 91.   On August 3, 2010, the news media circulated an undercover investigative
5 | report conducted by the GAO entitled, "For-Profit Colleges: Undercover Testing Finds
6 | Colleges Encouraged Fraud and Engaged in Deceptive and Questionable Marketing
7 | Practices."  The report concluded that (1) certain for-profit schools used deceptive
8 | recruiting practices; (2) certain for-profit schools "encouraged fraudulent practices" to
9 | their students such as falsifying their financial aid forms to qualify for federal aid; (3)
10 | certain for-profit schools substantially inflated their tuition costs; and (3) certain for-
11 | profit schools engaged in other "troubling" practices.  The *Wall Street Journal* reported
12 | that the GAO accused several colleges of encouraging fraud and engaging in deceptive
13 | and questionable marketing practices.  By using undercover tests at 15 for-profit
14 | colleges, the GAO "found that four privately held schools encouraged fraudulent
15 | practices and all 15 made deceptive or otherwise questionable statements to the GAO's
16 | undercover applicants."  Further, the *Wall Street Journal* reported the following:

> The GAO report said that four undercover applicants were encouraged by college personnel to falsify their financial-aid forms to qualify for federal aid, while other college representatives exaggerated potential salaries after graduation and failed to provide clear information about program duration, costs or graduation rates despite federal regulations requiring them to do so.
>
> The GAO said in the report that it plans to refer cases of school officials encouraging fraud and engaging in deceptive practices to the Department of Education's Office of Inspector General, where appropriate.
>
> The report is scheduled to be presented as part of the testimony Wednesday before the Senate Committee on Health, Education, Labor and Pensions, chaired by Sen. Tom Harkin (D., Iowa).
>
> "The results of this broad-reaching survey of for-profit school recruiting practices leave little question that these practices occur across the industry and are in no way limited to a few rogue

33

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

1    recruiters or even schools," a spokeswoman for Mr. Harkin said.

2       92.    On August 4, 2010, the U.S. Senate Health, Education, Labor and Pensions

3    Committee (the "Committee") held a congressional hearing on recruitment practices of

4    many of the for-profit educational providers.  Senator Tom Harkin, the Committee's

5    Chairman, noted in his remarks at the hearing that the GAO report illustrates that the

6    recruitment process at for-profit educational providers is "specifically designed to do

7    whatever it takes to drive up enrollment numbers, more often than not to the

8    disadvantage of students" and is "disturbingly clear that abuses in for-profit recruiting

9    are not limited to a few rogue recruiters or even a few schools with lax oversight.  To the

10   contrary, the evidence points to a problem that is systemic to the for-profit industry."

11      93.    On August 9, 2010, the Company filed a Form 8-K with the SEC disclosing

12   that it received a request for information from the Committee.  Specifically, the

13   Committee requested information:

14          [O]n how the Company recruits and enrolls students, sets
            program price or tuition, determines financial aid including
15          private or institutional loans, tracks attendance, handles
            withdrawal of students and return of Title IV dollars and
16          manages compliance with the *90/10* rule.  The request also
            seeks information regarding the number of students who
17          complete or graduate from the Company's programs, how
            many of those students find work in their fields of study,
18          the debt levels of students enrolling and completing
            programs and how the Company tracks and manages cohort
19          default rates.  The Committee has also requested that the
            Company provide a broad range of information about its
20          business, including detailed information relating to
            financial results, management, operations, personnel,
21          recruiting, enrollment, graduation, student withdrawals,
22          receipt of Title IV Program funds, accreditation, regulatory
            compliance and other matters.
23
24

25      94.    On August 13, 2010, the DOE released data showing estimated student loan

26   repayment rates.  Under the DOE's proposed "gainful employment" rule, for-profit

27   educational providers would fully qualify for federal aid in one of two ways: either more

28   than 45% of their former students are paying off principal on loans, or the debt burden of

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

1   former students is below 8% of total income or below 20% of discretionary income.

2   Accordingly, schools are eligible for federal loans if they prepare their students for

3   "gainful employment in a recognized profession" under the Higher Education Act of

4   1965. However, schools lose eligibility if repayment rates are below 35% or debt burden

5   is above 12 percent of total income and 30 percent of discretionary income.

6        95.    For Corinthian Colleges, the DOE data showed that 33 of the 86 colleges

7   had loan repayment rates of less than 20%, and at other campuses the rates were less

8   than 10%. As a result, Deutsche Bank AG downgraded Corinthian securities to "hold"

9   from "buy" citing the Company's "lower-than-feared" repayment rates.

10        96.    On August 20, 2010, the Company issued a press release that disclosed the

11   following:

12       ***Regulatory Update***

13   NPRM- The federal Department of Education, pursuant to
14   its rulemaking process, recently published two Notices of
    Proposed Rule Making (NPRM). The first NPRM,
15   published on June 18, 2010, focused on a range of issues
16   affecting private sector schools, including incentive
    compensation for admissions representatives,
17   misrepresentation, and gainful employment disclosures....
    The second NPRM, published on July 23, 2010, focuses
18   exclusively on gainful employment....

19   Senate HELP Committee - As part of its review of the
20   private sector education industry, the Senate Higher
    Education Labor and Pensions Committee ("Committee")
21   has requested information from approximately 30 private
22   sector education companies, including Corinthian. The
    information requested includes such areas as: recruiting and
23   enrollment practices, pricing policies, student financial aid
    processes, attendance tracking, student withdrawal policies,
24   *90/10* compliance, placement, completion, cohort default
25   rates, accreditation, and company financial results,
    management and operations. The Committee has requested
26   that a portion of the information be provided by August 26,
27   2010 and that the remainder be provided by September 16,
    2010. We are in the process of responding to the
28   Committee's request.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

Accreditation Status, Everest College Phoenix - Everest College Phoenix (ECP) consists of two ground schools and an online learning division and has approximately 5,800 students. On May 9, 2009, ECP was notified by the Higher Learning Commission of the North Central Association of Colleges and Schools (HLC), that ECP had been placed on probation. The probation action primarily focuses on questions about ECP's autonomy and governance as it relates to Corinthian's ownership.

An evaluation team from HLC visited ECP in May 2010, and, on July 27, 2010, issued a Report on a Comprehensive Evaluation Visit. In its report, the team noted that while there had been positive developments, deficiencies in other criteria were not sufficient to warrant removal of ECP's probationary status. The evaluation team has recommended the withdrawal of ECP's accreditation. We disagree with the evaluation team's recommendation, and intend to challenge its findings before the Commission over the next several months. We expect HLC's board to make a determination on ECP's probation status in November. If we disagree with the HLC board's decision, we could pursue an appeal that could last for several months beyond that time.

***Cohort Default Management Update***

During fiscal 2010, we restructured and expanded our cohort default management program and it was fully operational as of the end of the third quarter. Although we believe that our default management efforts have slowed the rate of increase for the 2009 cohort, **current trend information indicates that cumulative defaults have trended substantially higher for the 2009 cohort of students compared with the 2008 cohort at the same time last year**. Information currently available also indicates that **the number of our OPEIDs which could exceed DOE's 25% cohort default rate threshold for the 2009 cohort will be substantially higher than for the 2008 cohort**. In the 2008 cohort, nine of our OPEIDs exceeded the 25% threshold.

**We believe that continuing high unemployment, which is particularly challenging for the demographic we serve, has contributed to higher cohort default rates (CDRs)**. In addition, major structural changes in the

36

student lending industry over the past two years have negatively impacted CDRs. Such changes include: student lender bankruptcies in the wake of the 2008 credit crisis; the sale of distressed student loan portfolios to the federal government by bankrupt lenders or lenders that could no longer fund such loans; the lack of default management on distressed loans; the shift to direct lending and the associated phase out of guaranty agency responsibilities for default management.

These changes in student lending have reduced data timeliness and trend visibility. As more data has emerged, we have gained a more transparent view of how the changes have impacted the 2009 cohort of students. The most recent federal data indicates that the changes in student lending have increased cohort default rates substantially for the 2009 cohort.

Given the information recently available, **we now believe that up to three of our OPEIDs could exceed the federal threshold of 25% for three consecutive years under the current two-year measurement methodology. Under the current two-year methodology, OPEIDs which exceed the federal threshold of 25% for three consecutive years, or 40% in one year, become ineligible to participate in the Title IV student aid program**. We remain confident that none of our OPEIDs will exceed the 40% threshold for the 2009 cohort.

We expect the higher two-year rates for the 2009 cohort to translate into elevated three-year rates for the same cohort. We thus expect a majority of our OPEIDs to exceed the 30% threshold under the three year measurement for the 2009 cohort. Schools cannot be sanctioned under the three-year measurement methodology until 2014 (the year the 2011 cohort data will be final) on either the 30% or 40% thresholds, and we will aggressively pursue default mitigation efforts between now and then.
To help reduce cohort default rates for the 2010 cohort and beyond, and to improve student outcomes, in fiscal 2010 we began to reduce enrollments of students who lack a high school diploma or equivalent. These students attend our schools under the federal Ability to Benefit (ATB) program. At the end of fiscal 2010, ATB students represented 15% of our total student population, down from 24% at the same point in the prior year.

37

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

ATB students drop out at a higher rate, are more challenging to assist with career placement, and default on their loans at a higher rate than high school graduates. Although serving ATB students has historically been a part of Corinthian's mission, given the anticipated shift to a three-year CDR measurement period, and the impact of structural changes in the student lending environment, we will no longer be able to serve these students at our U.S. Everest and WyoTech campuses effective September 1, 2010. We will continue to help currently enrolled ATB students finish their programs and find employment.

97.   This press release was itself false and misleading. Though it belatedly disclosed some of the truth regarding the Company's higher Cohort Default Rate, it falsely blamed the increase in the default rate to the economy and higher unemployment. In reality, the default rate had been higher throughout the Relevant Time Period. Defendants failed to disclose the true default rate during the Relevant Time Period and improperly attempted to camouflage the true rate as a sudden "increase" at the end of the Relevant Time Period, after the truth was uncovered by the Department of Education following Congressional investigation. Moreover, Corinthian Colleges's higher default rate was not caused by higher unemployment but rather was a direct effect of the Company's improper recruiting efforts and the Company's lack of adequate internal controls.

98.   Further, in a conference call with the investing public, the Company postponed its Investor Day scheduled for September 15, 2010 due to "potential changes in regulation, the NPRM response and the Senate Committee information request due shortly and our recent decision to stop enrolling ATB students."

99.   As a result of the disclosures, the Company's stock fell over 52% from $9.25 on August 2, 2010 to $4.36 on August 24, 2010.

## VIII.   DAMAGES TO CORINTHIAN COLLEGES

100.   As a result of the Individual Defendants' wrongful conduct, Corinthian Colleges disseminated false financial statements which failed to disclose that the Company's tuition costs were inflated and its student loan repayment rates were well

38

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

below levels required for participation in federal loan programs. The improper statements have devastated Corinthian Colleges's credibility. Additionally, Corinthian Colleges is now the subject of class action lawsuits, alleging securities laws violations in connection with the improper financial reporting and false statements. The Company will face substantial costs in connection with these lawsuits.

101. As a direct and proximate result of the Individual Defendants' actions as alleged above, Corinthian Colleges's market capitalization has been substantially damaged.

102. Further, as a direct and proximate result of the Individual Defendants' conduct, Corinthian Colleges has expended and will continue to expend significant sums of money. Such expenditures include, but are not limited to:

(a)    costs incurred in investigating and defending Corinthian Colleges and certain officers in class action lawsuits, plus potentially hundreds of millions of dollars in settlement or to satisfy an adverse judgment;

(b)    costs incurred from compensation and benefits paid to the Individual Defendants, which compensation was based at least in part on Corinthian Colleges's artificially-inflated stock price and inflated revenues; and

(c)    costs incurred from the loss of the Company's customers' confidence in Corinthian Colleges's services.

103. Moreover, these actions have irreparably damaged Corinthian Colleges's corporate image and goodwill. For at least the foreseeable future, Corinthian Colleges will suffer from what is known as the "liar's discount," a term applied to the stocks of companies who have been implicated in illegal behavior and have misled the investing public, such that Corinthian Colleges's ability to raise equity capital or debt on favorable terms in the future is now impaired.

## IX.    INSIDER SELLING ALLEGATIONS

104. Defendant St. Pierre improperly used his inside knowledge of Corinthian Colleges's false and misleading statements about (i) the Company's inflated tuition

costs; (ii) the fact that the Company's student loan repayment rates were well below levels required for participation in federal loan programs; and (iii) the Company's inflated future growth prospects.  The following chart identifies St. Pierre's illegal insider sales of Corinthian Colleges stock:

| Insider Last Name | Transaction Date | Shares | Price | Proceeds |
|---|---|---|---|---|
| ST. PIERRE | 1/28/2009 | 20,000 | $18.29 | $365,994 |
| | 2/04/2009 | 20,000 | $21.11 | $422,176 |
| | 2/11/2009 | 20,000 | $21.12 | $422,496 |
| | 2/18/2009 | 20,000 | $20.52 | $410,320 |
| | 2/25/2009 | 20,000 | $19.85 | $396,982 |
| | 3/04/2009 | 20,000 | $18.39 | $367,756 |
| | 3/11/2009 | 5,400 | $18.00 | $97,220 |
| | 3/18/2009 | 20,000 | $18.21 | $364,252 |
| | 3/25/2009 | 20,000 | $19.89 | $397,922 |
| | 4/01/2009 | 9,600 | $18.79 | $180,399 |
| Total | | 175,000 | | $3,425,517 |

## X.    DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

105.   Plaintiff brings this action derivatively in the right and for the benefit of Corinthian Colleges to redress injuries suffered, and to be suffered, by Corinthian Colleges as a direct result of breaches of fiduciary duty, abuse of control, gross mismanagement, unjust enrichment, and insider selling, as well as the aiding and abetting thereof, by the Individual Defendants.  Corinthian Colleges is named as a Nominal Defendant solely in a derivative capacity.  This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

106.   Plaintiff will adequately and fairly represent the interests of Corinthian Colleges in enforcing and prosecuting its rights.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

1    107.   Plaintiff was a shareholder of Corinthian Colleges at the time of the

2    wrongdoing of which Plaintiff complains and has continuously held stock in the

3    Company at all relevant times.

4    108.   The Board of Corinthian Colleges currently consists of the following ten

5    individuals: Massimino, St. Pierre, Adler, Dionisio, Hartshorn, Kane, Lee, Skladany,

6    Sullivan, and Waller.

7    **A.    Demand Is Futile As To Defendants Massimino and Waller**

8    109.   Defendants Massimino and Waller face a substantial likelihood of liability

9    for their individual misconduct.  If Defendants Massimino and Waller pursued these

10   derivative claims, then that would expose their own misconduct in the class action for

11   violations of the federal securities laws.  This, in turn, would impair the defense of the

12   class action and greatly increase the probability of Defendants Massimino's and Waller's

13   personal liability in the class action.  As such, Defendants Massimino and Waller are

14   fatally conflicted, and therefore, unable to render a disinterested decision as to whether

15   the Company should pursue these derivative claims.  Thus, demand is futile as to

16   Defendants Massimino and Waller.

17   110.   Additionally, Defendants Massimino and Waller are not independent or

18   disinterested because they were/are high-ranking officers of Corinthian Colleges during

19   the time period when the wrongdoing occurred.  Defendant Massimino was the CEO of

20   the Company from November 2004 through June 2009.  Defendant Waller was the

21   Company's President and COO from February 2006 through June 2009.  Defendant

22   Waller has been the Company's CEO since July 2009.  According to relevant portions of

23   the Company's 2010 proxy statement, Defendants Massimino and Waller are not

24   independent directors under applicable NASDAQ Marketplace Rules and SEC

25   regulations.  Thus, Defendants Massimino and Waller cannot independently consider a

26   demand.

27   111.   Additionally, Defendants Massimino and Waller are interested because they

28   issued the false and misleading statements.  Defendants Massimino and Waller therefore

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

1 | face a substantial likelihood of liability for breaching their fiduciary duties to Corinthian

2 | Colleges shareholders. Consequently, Defendants Massimino and Waller cannot

3 | disinterestedly consider a demand.

4 | **B.    Demand Is Futile As To Defendant St. Pierre**

5 | 112.    Defendant St. Pierre, because of his high-level position at the Company,

6 | knew that Corinthian Colleges was engaging in illicit and improper recruiting tactics and

7 | that the Company's growth prospects were overstated. Defendant St. Pierre also knew

8 | that statements about the Company's operations were false and misleading because the

9 | Company failed to disclose that its increased margins were generated by improper

10 | marketing methods, obtaining federal funds for its students through material

11 | misrepresentations of its Cohort Default Rates. Defendant St. Pierre took advantage of

12 | this undisclosed information to sell his personally-held stock for considerably more than

13 | the stock was worth. Over a short three-month period, Defendant St. Pierre sold 175,000

14 | shares for proceeds of $3,425,517.

15 | 113.    Because Defendant St. Pierre received financial benefits from his insider

16 | trading transactions not received by other shareholders of the Company, Defendant St.

17 | Pierre is unable to render a disinterested decision on whether to pursue these derivative

18 | claims. As such, demand is futile as to Defendant St. Pierre.

19 | **C.    Demand Futility As To The Audit Committee Defendants**

20 | 114.    Defendants Adler, Hartshorn, Lee, and Dionisio were responsible under the

21 | Audit Committee charter for reviewing and approving quarterly and annual financial

22 | statements, earnings press releases, and Corinthian Colleges's internal controls over

23 | financial reporting. Despite these duties, the Audit Committee Defendants knowingly or

24 | recklessly reviewed and approved false financial statements that did not properly

25 | account for (i) the Company's inflated tuition costs; (ii) student loan repayment rates that

26 | were well below levels required for participation in federal loan programs; and (iii)

27 | future growth prospects. The Audit Committee Defendants also reviewed and approved

28 | Corinthian Colleges's financial reporting internal controls, which were ineffective.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

115.   As a result of (a) their access to and review of internal corporate documents; (b) conversations and connections with other corporate officers, employees and directors; and (c) attendance at management and Board meetings, each of the Audit Committee Defendants knew the adverse non-public information regarding Corinthian Colleges's business, operations, and management.  Indeed, each of the Audit Committee Defendants knew of the wrongdoing complained herein.  Thus each Audit Committee Defendant faces a sufficiently substantial likelihood of liability for their breaches of fiduciary duties, rendering any demand upon them futile.

116.   Defendants Adler, Hartshorn, Lee, and Dionisio authorized and/or permitted the false statements disseminated directly to the public or made directly to securities analysts and which were made available and distributed to shareholders, authorized and/or permitted the issuance of various improper statements and are principal beneficiaries of the wrongdoing alleged herein, and thus could not fairly and fully prosecute such a suit even if such suit was instituted by them.  Thus, they face a sufficiently substantial likelihood of liability for their breach of fiduciary duties, rendering any demand upon them futile.

**D.   Demand Is Futile As To All Of The Director Defendants For Additional Reasons**

117.   Corinthian Colleges specializes in providing for-profit education and relies substantially on the federal government to loan money to its students to pay for their education.  Corinthian Colleges's tuition costs and student loan repayment rates were a forceful indicator of the Company's business condition and the metric that the Company used to measure its current and future financial performance.   Indeed, when the information at issue pertains to a company's core business or service, as it does here, knowledge of that information may be imputed to the entire board through inference as a matter of law.  Thus, each of the members of the Corinthian Colleges Board are charged with having knowledge of the issues described herein related to the Company's false and misleading statements about it growth prospects and improper recruiting activities.

43

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

118.   The Director Defendants, as members of the Corinthian Colleges Board, each knew, failed to act in the face of a known duty to act, and/or were grossly negligent when they allowed the Company to issue public statements, press releases, and filings with the SEC regarding the Company's growth prospects and financial results. Moreover, the Director Defendants each knew, failed to act in the face of a known duty to act, and/or with gross negligence allowed this materially false and misleading information to be disseminated to the investing public.   The Director Defendants knowingly, with conscious disregard, and/or gross negligence participated in the dissemination of this deceptive information. Thus, demand is futile as to the Director Defendants.

119.   The Director Defendants, as members of the Corinthian Colleges Board, each had a duty to ensure that reliable systems of financial controls and reporting were in place at the Company and functioning properly.  Corinthian Colleges, however, did not accurately report its future growth prospects, tuition costs, or student loan repayment rates. The Director Defendants each knew, failed to act in the face of a known duty to act, and/or with gross negligence ignored the fact that the Company lacked adequate internal controls. Despite this, the Director Defendants took no steps to avert or correct the situation. The Company's lack of adequate internal controls allowed the materially false and misleading information regarding the Company's financial reporting to be disseminated to the investing public. Thus, the Director Defendants are each subject to a substantial likelihood of liability. Thus, demand is futile as to the Director Defendants.

120.   If Corinthian Colleges's current and past officers and directors are protected against personal liability for their acts of mismanagement, abuse of control and breach of fiduciary duties alleged in this Complaint by D&O Insurance, they caused the Company to purchase that insurance for their protection with corporate funds, *i.e.*, monies belonging to the shareholders.  However, Plaintiff is informed and believes that the D&O Insurance policies covering the Individual Defendants in this case contain provisions that eliminate coverage for any action brought directly by Corinthian

44

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

1  Colleges against the Individual Defendants, known as the "insured versus insured

2  exclusion." As a result, if the Director Defendants were to sue themselves or certain of

3  the officers of Corinthian Colleges, there would be no D&O Insurance protection, and

4  thus, this is a further reason why they will not bring such a suit. On the other hand, if the

5  suit is brought derivatively, as this action is brought, such insurance coverage exists and

6  will provide a basis for the Company to effectuate recovery. Therefore, the Director

7  Defendants cannot be expected to file a derivative lawsuit because such a claim might

8  not be covered under the Company's D&O insurance policy.

9      121.  Under the factual circumstances described herein, the Individual Defendants

10  are more interested in protecting themselves than they are in protecting Corinthian

11  Colleges by prosecuting this action. Therefore, demand on Corinthian Colleges and its

12  Board is futile and is excused.

13      122.  Corinthian Colleges has been and will continue to be exposed to significant

14  losses due to the Individual Defendants' wrongdoing. Yet, the Director Defendants have

15  not filed any lawsuits against themselves or others who were responsible for the

16  wrongful conduct. Thus, the Director Defendants are breaching their fiduciary duties to

17  the Company and face a sufficiently substantial likelihood of liability for their breaches,

18  rendering any demand upon them futile.

19                          **COUNT I**

20      **Against All Defendants for Breach of Fiduciary Duty**

21      123.  Plaintiff incorporates by reference and realleges each and every allegation

22  contained above, as though fully set forth herein.

23      124.  Defendants owed and owe Corinthian Colleges fiduciary obligations. By

24  reason of their fiduciary relationships, Defendants owed and owe Corinthian Colleges

25  the highest obligation of good faith, fair dealing, loyalty, due care, reasonable inquiry,

26  oversight and supervision.

27      125.  Defendants violated and breached their fiduciary duties of good faith, fair

28  dealing, loyalty, due care, reasonable inquiry, oversight and supervision.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

126.   Defendants each knowingly, recklessly or negligently signed or approved the issuance of false annual and quarterly financial statements that misrepresented and failed to disclose material information concerning the Company's growth prospects, tuition costs, and student loan repayment rates.  These actions could not have been a good faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

127.   As a direct and proximate result of Defendants' failure to perform their fiduciary obligations, Corinthian Colleges has sustained significant damages.  As a result of the misconduct alleged herein, these Defendants are liable to the Company.

128.   Plaintiff, on behalf of Corinthian Colleges, has no adequate remedy at law.

## COUNT II

### Against Defendants Massimino, Waller, Ouimet, and Ord for Unjust Enrichment

129.   Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

130.   By their wrongful acts and omissions, Defendants Massimino, Waller, Ouimet, and Ord were unjustly enriched at the expense of and to the detriment of Corinthian Colleges.

131.   Defendants Massimino, Waller, Ouimet, and Ord were unjustly enriched because they received compensation from the Company which was tied to the Company's performance during times when such Defendants knew or should have known that the Company's financial results and performance were artificially inflated due to Defendants' wrongdoing.

132.   Plaintiff, as a shareholder and representative of Corinthian Colleges, seeks restitution from these Defendants and seeks an order of this Court disgorging all profits, benefits, and other compensation obtained by these Defendants from their wrongful conduct and fiduciary breaches.

133.   Plaintiff, on behalf of Corinthian Colleges, has no adequate remedy at law.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

# COUNT III

## Against Defendant St. Pierre for Breach of Fiduciary Duty for Insider Selling and Misappropriation of Information

134.  Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

135.  At the time Defendant St. Pierre sold his Corinthian Colleges stock, he knew the information described above, and sold Corinthian Colleges stock on the basis of such information.

136.  The information described above was proprietary non-public information concerning the Company's financial condition and future business prospects.  It was a proprietary asset belonging to the Company, which Defendant St. Pierre used for his own benefit when he sold Corinthian Colleges stock.

137.  At the time of his stock sales, Defendant St. Pierre knew that the Company's financial results were overstated due to the wrongdoing alleged herein.  St. Pierre's sales of Corinthian Colleges stock while in possession and control of this material adverse, non-public information was a breach of his fiduciary duty of loyalty and good faith.

138.  Since the use of the Company's proprietary information for his own gain constitutes a breach of Defendant St. Pierre's fiduciary duties, the Company is entitled to the imposition of a constructive trust on any profits he obtained thereby.

139.  Plaintiff, on behalf of Corinthian Colleges, has no adequate remedy at law.

## XI.   PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment as follows:

A.    Against all the Individual Defendants for the amount of damages sustained by the Company as a result of the Individual Defendants' breaches of fiduciary duties, aiding and abetting breaches of fiduciary duty, and unjust enrichment;

B.    Directing Corinthian Colleges to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

laws and to protect Corinthian Colleges and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote resolutions for amendments to the Company's By-Laws or Articles of Incorporation and taking such other action as may be necessary to place before shareholders for a vote the following Corporate Governance Policies:

- a proposal to strengthen the Board's supervision of recruitment operations and policies;

- a proposal to strengthen internal controls and policies concerning student eligibility for federal financial aid and for monitoring and reporting Cohort Default Rates;

- a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board;

- a provision to permit the shareholders of Corinthian Colleges to nominate at least two candidates for election to the Board;

- a proposal to ensure the accuracy of the qualifications of Corinthian Colleges's directors, executives and other employees;

- a proposal to strengthen the Company's procedures for the receipt, retention and treatment of complaints received by the Company regarding accounting, internal controls and auditing matters; and

- a provision to appropriately test and then strengthen the internal audit and control functions;

C.     Awarding to Corinthian Colleges restitution from the Individual Defendants, and each of them, and ordering disgorgement of all profits, benefits and other compensation obtained by the Individual Defendants;

D.     Awarding to Plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

E.     Granting such other and further relief as the Court deems just and proper.

//

//

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

**XII.   JURY DEMAND**

Plaintiff demands a trial by jury.

DATED:  October 19, 2010

JOHNSON BOTTINI, LLP
FRANK J. JOHNSON (174882)
FRANCIS A. BOTTINI JR.(175783)
KEITH M. COCHRAN (254346)

FRANCIS A. BOTTINI, JR.

501 West Broadway, Suite 1720
San Diego, California 92101
Telephone:  (619) 230-0063
Facsimile:   (619) 238-0622

*Attorneys for Plaintiff David Realty
Company*

49

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

## VERIFICATION

I, David Martin, on behalf of David Realty Company, hereby verify that David Realty Company is a shareholder of Corinthian Colleges, Inc. (the "Company"), and is ready, willing, and able to pursue this action in the hope of improving the Company and recovering damages for the Company caused by the defendants' conduct. I have reviewed the allegations made in this Verified Shareholder Derivative Complaint and to those allegations of which I have personal knowledge believe those allegations to be true. As to those allegations of which I do not have personal knowledge, I rely upon my counsel and their investigation and believe them to be true. Having received a copy of this Verified Shareholder Derivative Complaint, having reviewed it with counsel, I hereby authorize its filing.

Date: 10/11/2010

David Martin, for David Realty Company

- 1 -

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

### NOTICE OF ASSIGNMENT TO UNITED STATES MAGISTRATE JUDGE FOR DISCOVERY

This case has been assigned to District Judge David O. Carter and the assigned discovery Magistrate Judge is John E. McDermott.

The case number on all documents filed with the Court should read as follows:

## SACV10- 1597 DOC (JEMx)

Pursuant to General Order 05-07 of the United States District Court for the Central District of California, the Magistrate Judge has been designated to hear discovery related motions.

All discovery related motions should be noticed on the calendar of the Magistrate Judge

= = = = = = = = = = = = = = = = = = = = = = = = = = = = = = = = = = = = = = =

**NOTICE TO COUNSEL**

*A copy of this notice must be served with the summons and complaint on all defendants (if a removal action is filed, a copy of this notice must be served on all plaintiffs).*

Subsequent documents must be filed at the following location:

| [_] Western Division | [X] Southern Division | [_] Eastern Division |
|---|---|---|
| 312 N. Spring St., Rm. G-8 | 411 West Fourth St., Rm. 1-053 | 3470 Twelfth St., Rm. 134 |
| Los Angeles, CA 90012 | Santa Ana, CA 92701-4516 | Riverside, CA 92501 |

Failure to file at the proper location will result in your documents being returned to you.

JOHNSON BOTTINI, LLP
FRANK J. JOHNSON (174882)
FRANCIS A. BOTTINI, JR. (175783)
501 West Broadway, Suite 1720
San Diego, California 92101
Tel.: (619) 230-0063

## UNITED STATES DISTRICT COURT
### CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| DAVID REALTY COMPANY, derivatively on behalf of CORINTHIAN COLLEGES, INC. <br><br> PLAINTIFF(S) <br><br> v. <br><br> JACK D. MASSIMINO, PAUL ST. PIERRE, HANK ADLER, JOHN DIONISIO, TERRY O. HARTSHORN, ALICE T. KANE, ROBERT LEE, LINDA AREY SKLADANY, TIMOTHY SULLIVAN, PETER C. WALLER, MATTHEW A. OUIMET, KENNETH S. ORD, and DOES 1 - 25, inclusive, <br><br> Defendants, <br><br> v. <br><br> CORINTHIAN COLLEGES, INC., a Delaware corporation, <br><br> Nominal Defendant. | CASE NUMBER <br> **SACV10-1597 DOC(JEMx)** <br><br><br><br> **SUMMONS** |

TO:   DEFENDANT(S): _____

_____

A lawsuit has been filed against you.

Within __21__ days after service of this summons on you (not counting the day you received it), you must serve on the plaintiff an answer to the attached ☑ complaint ☐ _____ amended complaint ☐ counterclaim ☐ cross-claim or a motion under Rule 12 of the Federal Rules of Civil Procedure.   The answer or motion must be served on the plaintiff's attorney, _Francis A. Bottini, Jr._____, whose address is _501 W. Broadway, Suite 1720, San Diego, California 92101_____ . If you fail to do so, judgment by default will be entered against you for the relief demanded in the complaint.  You also must file your answer or motion with the court.

Clerk, U.S. District Court

Dated: _10/19/10_

By: _____
TRINA DEBOSE
Deputy Clerk

(Seal of the Court)

*[Use 60 days if the defendant is the United States or a United States agency, or is an officer or employee of the United States. Allowed 60 days by Rule 12(a)(3)].*

## UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA
### CIVIL COVER SHEET

| I (a) PLAINTIFFS (Check box if you are representing yourself ☐) | DEFENDANTS |
|---|---|
| DAVID REALTY COMPANY, Derivatively on behalf of CORINTHIAN COLLEGES, INC. | JACK D. MASSIMINO, PAUL ST. PIERRE, HANK ADLER, JOHN DIONISIO, TERRY O. HARTSHORN, ALICE T. KANE, ROBERT LEE, LINDA AREY SKLADANY, TIMOTHY SULLIVAN, ET AL. |

| (b) Attorneys (Firm Name, Address and Telephone Number. If you are representing yourself, provide same.) | Attorneys (If Known) |
|---|---|
| JOHNSON BOTTINI, LLP, Francis A. Bottini, Jr. (175783), 501 W. Broadway, Ste. 1720, San Diego, California 92101, Tel. No. (619) 230-0063 | |

**II. BASIS OF JURISDICTION** (Place an X in one box only.)

☐ 1 U.S. Government Plaintiff  ☐ 3 Federal Question (U.S. Government Not a Party)

☐ 2 U.S. Government Defendant  ☒ 4 Diversity (Indicate Citizenship of Parties in Item III)

**III. CITIZENSHIP OF PRINCIPAL PARTIES** - For Diversity Cases Only
(Place an X in one box for plaintiff and one for defendant.)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business in this State | ☐ 4 | ☒ 4 |
| Citizen of Another State | ☒ 2 | ☐ 2 | Incorporated and Principal Place of Business in Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

**IV. ORIGIN** (Place an X in one box only.)

☒ 1 Original Proceeding  ☐ 2 Removed from State Court  ☐ 3 Remanded from Appellate Court  ☐ 4 Reinstated or Reopened  ☐ 5 Transferred from another district (specify):  ☐ 6 Multi-District Litigation  ☐ 7 Appeal to District Judge from Magistrate Judge

**V. REQUESTED IN COMPLAINT: JURY DEMAND:** ☒ Yes  ☐ No (Check 'Yes' only if demanded in complaint.)

**CLASS ACTION under F.R.C.P. 23:** ☐ Yes  ☒ No   ☒ MONEY DEMANDED IN COMPLAINT: $ Proof

**VI. CAUSE OF ACTION** (Cite the U.S. Civil Statute under which you are filing and write a brief statement of cause. Do not cite jurisdictional statutes unless diversity.)
28 U.S.C. §1332

**VII. NATURE OF SUIT** (Place an X in one box only.)

| OTHER STATUTES | CONTRACT | TORTS PERSONAL INJURY | TORTS PERSONAL PROPERTY | PRISONER PETITIONS | LABOR |
|---|---|---|---|---|---|
| ☐ 400 State Reapportionment | ☐ 110 Insurance | ☐ 310 Airplane | ☐ 370 Other Fraud | ☐ 510 Motions to Vacate Sentence Habeas Corpus | ☐ 710 Fair Labor Standards Act |
| ☐ 410 Antitrust | ☐ 120 Marine | ☐ 315 Airplane Product Liability | ☐ 371 Truth in Lending | | ☐ 720 Labor/Mgmt. Relations |
| ☐ 430 Banks and Banking | ☐ 130 Miller Act | ☐ 320 Assault, Libel & Slander | ☐ 380 Other Personal Property Damage | ☐ 530 General | ☐ 730 Labor/Mgmt. Reporting & Disclosure Act |
| ☐ 450 Commerce/ICC Rates/etc. | ☐ 140 Negotiable Instrument | ☐ 330 Fed. Employers' Liability | ☐ 385 Property Damage Product Liability | ☐ 535 Death Penalty | ☐ 740 Railway Labor Act |
| ☐ 460 Deportation | ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 340 Marine | BANKRUPTCY | ☐ 540 Mandamus/ Other | ☐ 790 Other Labor Litigation |
| ☐ 470 Racketeer Influenced and Corrupt Organizations | ☐ 151 Medicare Act | ☐ 345 Marine Product Liability | ☐ 422 Appeal 28 USC 158 | ☐ 550 Civil Rights | ☐ 791 Empl. Ret. Inc. Security Act |
| ☐ 480 Consumer Credit | ☐ 152 Recovery of Defaulted Student Loan (Excl. Veterans) | ☐ 350 Motor Vehicle | ☐ 423 Withdrawal 28 USC 157 | ☐ 555 Prison Condition | PROPERTY RIGHTS |
| ☐ 490 Cable/Sat TV | | ☐ 355 Motor Vehicle Product Liability | CIVIL RIGHTS | FORFEITURE / PENALTY | ☐ 820 Copyrights |
| ☐ 810 Selective Service | ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 360 Other Personal Injury | ☐ 441 Voting | ☐ 610 Agriculture | ☐ 830 Patent |
| ☐ 850 Securities/Commodities/ Exchange | ☐ 160 Stockholders' Suits | ☐ 362 Personal Injury-Med Malpractice | ☐ 442 Employment | ☐ 620 Other Food & Drug | ☐ 840 Trademark |
| ☐ 875 Customer Challenge 12 USC 3410 | ☐ 190 Other Contract | ☐ 365 Personal Injury-Product Liability | ☐ 443 Housing/Acco-mmodations | ☐ 625 Drug Related Seizure of Property 21 USC 881 | SOCIAL SECURITY |
| ☐ 890 Other Statutory Actions | ☐ 195 Contract Product Liability | ☐ 368 Asbestos Personal Injury Product Liability | ☐ 444 Welfare | | ☐ 861 HIA (1395ff) |
| ☐ 891 Agricultural Act | ☐ 196 Franchise | | ☐ 445 American with Disabilities - Employment | ☐ 630 Liquor Laws | ☐ 862 Black Lung (923) |
| ☐ 892 Economic Stabilization Act | REAL PROPERTY | IMMIGRATION | ☐ 446 American with Disabilities - Other | ☐ 640 R.R. & Truck | ☐ 863 DIWC/DIWW (405(g)) |
| ☐ 893 Environmental Matters | ☐ 210 Land Condemnation | ☐ 462 Naturalization Application | ☐ 440 Other Civil Rights | ☐ 650 Airline Regs | ☐ 864 SSID Title XVI |
| ☐ 894 Energy Allocation Act | ☐ 220 Foreclosure | ☐ 463 Habeas Corpus-Alien Detainee | | ☐ 660 Occupational Safety /Health | ☐ 865 RSI (405(g)) |
| ☐ 895 Freedom of Info. Act | ☐ 230 Rent Lease & Ejectment | ☐ 465 Other Immigration Actions | | ☐ 690 Other | FEDERAL TAX SUITS |
| ☐ 900 Appeal of Fee Determination Under Equal Access to Justice | ☐ 240 Torts to Land | | | | ☐ 870 Taxes (U.S. Plaintiff or Defendant) |
| ☐ 950 Constitutionality of State Statutes | ☐ 245 Tort Product Liability | | | | ☐ 871 IRS-Third Party 26 USC 7609 |
| | ☐ 290 All Other Real Property | | | | |

## SACV10-1597 DOC(JEMx)

**FOR OFFICE USE ONLY:**   Case Number:

AFTER COMPLETING THE FRONT SIDE OF FORM CV-71, COMPLETE THE INFORMATION REQUESTED BELOW.

# UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA
## CIVIL COVER SHEET

**VIII(a).  IDENTICAL CASES:** Has this action been previously filed in this court and dismissed, remanded or closed?  ☑ No  ☐ Yes
If yes, list case number(s): _____

**VIII(b).  RELATED CASES:** Have any cases been previously filed in this court that are related to the present case?  ☑ No  ☐ Yes
If yes, list case number(s): _____

Civil cases are deemed related if a previously filed case and the present case:
(Check all boxes that apply)   ☐ A.  Arise from the same or closely related transactions, happenings, or events; or
  ☐ B.  Call for determination of the same or substantially related or similar questions of law and fact; or
  ☐ C.  For other reasons would entail substantial duplication of labor if heard by different judges; or
  ☐ D.  Involve the same patent, trademark or copyright, _and_ one of the factors identified above in a, b or c also is present.

**IX.  VENUE:**  (When completing the following information, use an additional sheet if necessary.)

(a)  List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which EACH named plaintiff resides.
☐   Check here if the government, its agencies or employees is a named plaintiff.  If this box is checked, go to item (b).

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
|  | Caddo Parish, Louisiana |

(b)  List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which EACH named defendant resides.
☐   Check here if the government, its agencies or employees is a named defendant.  If this box is checked, go to item (c).

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
| See attached. |  |

(c)  List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which EACH claim arose.
  Note: In land condemnation cases, use the location of the tract of land involved.

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
| Orange County |  |

* Los Angeles, Orange, San Bernardino, Riverside, Ventura, Santa Barbara, or San Luis Obispo Counties
Note: In land condemnation cases, use the location of the tract of land involved

X.  SIGNATURE OF ATTORNEY (OR PRO PER)  _____   Date  10/18/10

**Notice to Counsel/Parties:**  The CV-71 (JS-44) Civil Cover Sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law.  This form, approved by the Judicial Conference of the United States in September 1974, is required pursuant to Local Rule 3-1 is not filed but is used by the Clerk of the Court for the purpose of statistics, venue and initiating the civil docket sheet.  (For more detailed instructions, see separate instructions sheet.)

Key to Statistical codes relating to Social Security Cases:

| Nature of Suit Code | Abbreviation | Substantive Statement of Cause of Action |
|---|---|---|
| 861 | HIA | All claims for health insurance benefits (Medicare) under Title 18, Part A, of the Social Security Act, as amended. Also, include claims by hospitals, skilled nursing facilities, etc., for certification as providers of services under the program. (42 U.S.C. 1935FF(b)) |
| 862 | BL | All claims for "Black Lung" benefits under Title 4, Part B, of the Federal Coal Mine Health and Safety Act of 1969. (30 U.S.C. 923) |
| 863 | DIWC | All claims filed by insured workers for disability insurance benefits under Title 2 of the Social Security Act, as amended; plus all claims filed for child's insurance benefits based on disability. (42 U.S.C. 405(g)) |
| 863 | DIWW | All claims filed for widows or widowers insurance benefits based on disability under Title 2 of the Social Security Act, as amended. (42 U.S.C. 405(g)) |
| 864 | SSID | All claims for supplemental security income payments based upon disability filed under Title 16 of the Social Security Act, as amended. |
| 865 | RSI | All claims for retirement (old age) and survivors benefits under Title 2 of the Social Security Act, as amended. (42 U.S.C. (g)) |

| Defendant | County in CA/Out of State Residence |
| --- | --- |
| Jack D. Massimino | Summit County, Utah |
| Paul St. Pierre | Orange County |
| Hank Adler | Orange County |
| John Dionisio | Nassau County, New York |
| Terry O. Hartshorn | Orange County |
| Alice T. Kane | Westchester County, New York |
| Robert Lee | Unknown County, California |
| Linda Arey Skladany | Arlington County, Virginia |
| Timothy Sullivan | Unknown County, Virginia |
| Peter C. Waller | Orange County |
| Matthew A. Ouimet | Orange County |
| Kenneth S. Ord | Orange County |
| Corinthian Colleges, Inc. | Orange County |